IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| KERR CORPORATION, ) | |
| ) | Case No. 1:05CV0621 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge Ann Aldrich |
| THE FREEMAN MANUFACTURING & ) | |
| SUPPLY COMPANY, ) | |
| ) | <u>MEMORANDUM AND ORDER</u> |
| Defendant. ) | |

This is a trade dispute before the court on both diversity and federal question jurisdiction. Plaintiff Kerr Corporation ("Kerr") seeks relief for trademark and trade dress infringement, false advertising, unfair competition, and related common-law offenses allegedly committed by The Freeman Manufacturing & Supply Company ("Freeman"). On March 2, 2005, Judge Gaughan, acting on the court's behalf, issued a marginal order denying Kerr's request for a temporary restraining order, finding that Kerr "has failed to demonstrate irreparable harm" and that "money damages would be adequate to compensate plaintiff for its alleged injuries."(Docket No. 9) Now before the court is a motion for preliminary injunction filed by Kerr. (Docket No. 4) A hearing on this motion took place on June 30, 2005. For the following reasons, the court denies the motion.

**I. Background**

Kerr is a Delaware corporation with its principal place of business in Orange, California. Kerr is engaged in the design, manufacture, and sale of waxes for use in the jewelry and optical markets. Freeman is an Ohio corporation with its principal place of business in Avon. In its motion, as in its Verified Complaint, Kerr

-2-

outlines the terms of an agreement between the parties entered into on September 1, 1984 ("the Agreement" or "the 1984 Agreement"). Freeman, which had been manufacturing waxes for Kerr since 1975 (first in brick form, and later as flakes), would continue to do so under the Agreement, and to provide assistance in developing "wax technology" for Kerr. Said "technology," including "all know-how, inventions, improvements or discoveries ... arising out of work performed" by Freeman under the Agreement was to become the property of Kerr. In exchange for this information and work product, Kerr paid Freeman a monthly consulting fee (the amount of which was increased pursuant to a November 1991 amendment to the Agreement).

Both parties operated successfully under the Agreement for many years. In 1985, Freeman developed an optical soluble wax ("one of Kerr's top-selling wax products"), as well as undertaking work on dental waxes and "sticky wax" for Kerr. In 1988, Freeman aided Kerr with the development of "Flex-Plast" injection wax, designed to compete with a competitor's "Plast-O-Wax" product. In 1997, Kerr alleges that it enlisted Freeman to develop "Pearls," a wax product line to be sold in a bead form. In 1998, Freeman developed "ACCU Carve," described by Kerr as another of its most popular injection wax products. In 1987, the parties supplemented the original agreement with a Distributorship Agreement, under which Freeman was to be the sole manufacturer of Kerr-brand jewelry waxes.

However, in 2003 and 2004 a number of disputes arose under the Distributorship Agreement, resulting in a further agreement which terminated the distributorship. The latter took effect February 1, 2005. Kerr claims that it has paid more than $380,000 to Freeman under the terms of the 1984 Agreement, but that as of March of 2004, Freeman has refused all of its monthly payments. Additionally, Kerr claims that Freeman has refused to turn over the "know-how, improvements, and discoveries" belonging to Kerr under the 1984 Agreement, thereby forcing Kerr to reverse engineer its own products in order to continue selling wax. Finally, Kerr claims

that Freeman has begun to market injection waxes bearing the identical colors and names of Kerr wax products.

Kerr claims that Freeman's infringing behavior commenced in or about February of 2005, and that since that time Freeman has sent announcements to distributors claiming that the injection waxes developed under the Agreement with Kerr are in fact the property of Freeman. Kerr also complains that Freeman's conduct (using visually identical waxes bearing Kerr trade names and colored according to Kerr's unique scheme) has confused both distributors and end users. Kerr's claims for relief include counts of false designation of origin and unfair competition under a portion of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1125(a)[1]; trademark and trade dress infringement and false advertising under the Lanham Act;

---

[1] 15 U.S.C. § 1125(a) provides, in pertinent part:

    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

violation of the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.*[2]; breach of contract; common-law misappropriation; conversion; and unjust enrichment.

At the hearing before the court on June 30, 2005, counsel for Kerr presented argument in support of its request for an order enjoining Freeman from utilizing or applying "new technology" as defined in the 1984 Agreement, manufacturing the wax products sold by Kerr as "Flex-Plast," "ACCU Carve," "Optical Soluble Wax," or "Pearls," using the Kerr color coding scheme, wax names, or the term "flakes" to describe Freeman

---

[2] O.R.C. § 4165.01 provides, in pertinent part:

A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;

...

(7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(8) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(10) Disparages the goods, services, or business of another by false representation of fact;

(11) Advertises goods or services with intent not to sell them as advertised;

(12) Makes false statements of fact concerning the reasons for, existence of, or amounts of price reductions ...

products, or representing that the wax formulations in question are the property of Freeman. Kerr also seeks immediate disclosure of certain disputed formulae and other "know-how, inventions, improvements, and discoveries."

## II. Discussion

In deciding whether to grant a preliminary injunction,

> a district court must give consideration to four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. Federal Rule of Civil Procedure 52(c) requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue.

*ACLU v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003), citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998), *In re DeLorean Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985). These four factors are not to be mechanically imposed. *See Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537-28 (6th Cir. 1978). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001), quoting *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir.1997). A preliminary injunction is an extraordinary remedy which should only be granted if the movant carries his or her burden of persuasion. *See Stenberg v. Checker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

### A. Likelihood of Success on the Merits

Kerr argues that it is likely to succeed on the merits because of the clear existence of a contract bearing unambiguous terms, and because of Freeman's evident breach of said contract. At the June 30 hearing, counsel for Kerr pointed repeatedly to the terms of the 1984 Agreement, under which Freeman was evidently obligated

-5-

to disclose know-how, formulae, and trade secrets related to the development of "new technology." However, some dispute remains as to how much of the composition of Freeman's current wax products was developed as "new technology" under the 1984 Agreement. Freeman argues that the products sold by Kerr during the life of the Agreement consisted primarily of "minor modifications" on existing products sold by Freeman prior to 1984, and therefore not subject to disclosure. (As one example, Freeman claims that its current "Tough Guy Green" wax was sold by Freeman under that name prior to the onset of the agreement with Kerr; the wax sold by Kerr from 1984 onward was known as "Tuffy Green.") The persistence of credible claims on each side of the contract dispute convinces the court that Kerr has shown some likelihood of success on the merits of these claims, though not an overwhelming likelihood.

Kerr also submits that it is likely to prevail on its Lanham Act claims, as Freeman's use of the unique color coding scheme, the Kerr wax names, and the alleged "Flake" trademark is likely to cause confusion. More specifically, Kerr cites the eight-factor test for likelihood of confusion articulated by the Sixth Circuit in *Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997):

    1. strength of the senior mark;
    2. relatedness of the goods or services;
    3. similarity of the marks;
    4. evidence of actual confusion;
    5. marketing channels used;
    6. likely degree of purchaser care;
    7. the intent of defendant in selecting the mark; and
    8. likelihood of expansion of the product lines.

*Id.* at 280, citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). Kerr asserts that factors 1-5 and 7 "overwhelmingly weigh" in its favor.

At the June 30 hearing, counsel for Kerr presented evidence and argument tending to show a great deal of care and investment into developing the distinctive names and colors of Kerr waxes during the life of the

-6-

1984 Agreement. Moreover, the court is aware that the goods at issue are approximately the same products, bearing very similar chemical compositions and nearly identical, if not precisely identical, colors. And there is little doubt that Freeman sought to use readily identifiable colors and names in marketing its waxes after the expiration of the Kerr Agreement.

As noted *supra*, however, there remains some doubt as to whether the colors and wax names at issue are entirely the product of Kerr-sponsored innovation, or whether some credit for the invention of these indicia must be given to Freeman as it operated pre-1984. Perhaps more crucially, counsel for Kerr did not address the applicability of factor 6 in his analysis. Both parties acknowledge that the purchasers of their products are distributors and end users of jewelry wax, the latter group consisting of jewelers with sophisticated and highly specific preferences. (*E.g.*, a stated preference for one color of wax over another, chemically-identical shade.) The court finds that, under such circumstances, the likelihood of purchaser care is great, and therefore the overall likelihood of confusion is considerably slighter than Kerr would allege. Kerr has therefore shown only some likelihood of success on the merits of its infringement claims.

**B. Irreparable Injury**

A high degree of purchaser care also mitigates the potential degree of harm risked by Kerr in the absence of an injunction. Again, jewelers seeking specific chemical and chromatic properties from the wax products they purchase make up the bulk of consumers impacted by this litigation. In the event of a victory by Kerr at trial, the subset of jewelers who resume using Kerr products can be determined, and appropriate monetary damages assessed. Under such circumstances, one would also expect less of the "possible risk to reputation" held by the Sixth Circuit in *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) to imply irreparable harm. In conjunction with its finding that customer confusion is not necessarily likely, the court finds the probability of irreparable harm to Kerr not established.

-7-

**C. Harm to Others and the Public Interest**

By contrast, the court is persuaded by Freeman's argument that injunctive relief of the type requested by Kerr – including compelled disclosure of trade secrets such as processes and formulae – could potentially work serious and lasting harm on Freeman. While a Kerr victory following trial could result in reimbursement to Kerr for reverse engineering expenses and the costs of litigation, a Freeman victory following entry of an injunction could not result in Kerr's "unlearning" the information divulged. This factor thus weighs heavily against the entry of a preliminary injunction.

Finally, while Kerr may claim a generalized public interest in the enforcement of trademark and contract rights, *see e.g.*, *DAP Prods., Inc. v. Color Tile Mfg., Inc.*, 821 F. Supp. 488, 494 (S.D. Oh., 1993), this argument is weak in light of the potential (and very specific) damages to Freeman. The continued dispute over Kerr's rights and Freeman's obligations under the 1984 agreement weakens it further.

In sum, the court finds that Kerr's potential likelihood of success on the merits and its risk of monetary harm in the absence of an injunction are outweighed by the substantial harm likely to be visited on Freeman if injunctive relief is granted.

### IV. Conclusion

For the foregoing reasons, the court denies the plaintiff's motion for injunctive relief. The parties are instructed to proceed with discovery in preparation for trial.

IT IS SO ORDERED.

    /s/ Ann Aldrich
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: July 12, 2005**