**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **KERR CORPORATION,** | ) **Case No. 1:05CV0621** |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) **JUDGE ANN ALDRICH** |
| | ) |
| **FREEMAN MANUFACTURING** | ) |
| **& SUPPLY COMPANY,** | ) |
| | ) |
| **Defendant.** | ) <u>**MEMORANDUM AND ORDER**</u> |

This matter is before the court upon defendant's motion for summary judgment (Doc. No. 43) and plaintiff's motion for partial summary judgment (Doc. No. 42).  For the following reasons, defendant's motion is granted in part and denied in part, and plaintiff's motion is denied.

**I.  Background**

Since the late 1970's, defendant, the Freeman Manufacturing & Supply Company ("Freeman"), has been developing original formulas for colored injection wax, optical soluble wax, and flake-form wax products.  Plaintiff, the Kerr Corporation ("Kerr"), sold color-coded, flake-form injection waxes for jewelry and optics, which were manufactured by Freeman.  In 1984, the two companies entered into a Development Agreement ("the Agreement"), which provided that Freeman would undertake research and development of wax technology for projects proposed in writing by Kerr, in exchange for a monthly consultation fee (later re-negotiated to a $1,000.00 per month retainer fee and a $100.00 per hour labor cost).  All "know-how, inventions, improvements or discoveries, patentable or otherwise, if any, arising out of the work performed under this Agreement

(collectively "New Technology") [would become] the exclusive property of Kerr."  In the early part of this relationship, Freeman performed competitor analysis for Kerr.

During the next twenty years, Freeman improved the seven color-coded injection wax products (e.g., "Ruby Red"); and it developed "NYC Pink" injection wax, optical soluble wax #18423, inlay dental waxes, "Flex-Plast" injection wax, "Pearls" bead-form wax, and "ACCU Carve" injection flake-form wax (collectively, "Contested Technology").  Though the term "flake" had been used by Freeman and others throughout the industry prior to these developments, Kerr trademarked the name "Flakes" in 1999.

Recently, Freeman has begun to compete with Kerr in the sale of colored wax products, flake-form wax products, and other Contested Technology.  Both companies have proceeded to market these products under the belief that they own the underlying formulas.  Kerr marketed the colors at issue as Tuffy Green, NYC Pink, and Flex-Plast, while Freeman began marketing those colors as Tuf Guy Green, Filigree Pink, and Flexible Blue.  Freeman, in its advertising and technical literature, refers to its colors as "formerly" Tuffy Green, NYC Pink, and Flex-Plast, and has sent out letters to customers explaining the changed business relationship between itself and Kerr.  Freeman asserts in these letters that because it no longer manufactures the waxes from Kerr and has not released the formulas, (themselves difficult to reverse engineer), the Kerr waxes may not be chemically identical to those Freeman has long manufactured, and allowed Kerr to sell over the preceding years.  Despite these clarifying letters, Kerr has provided some anecdotal evidence that customers at trade fairs have asked about the relationship between the two companies and their waxes.

Kerr's complaint alleges that Freeman has violated the Lanham Act, 15 U.S.C. § 1125(a), by competing against (Count I) and/or infringing upon (Count II) Kerr's (1) color-coding scheme, (2) wax color names, (3) flake-form, and (4) "Flakes" trademark, through false designation of origin, and false descriptions or misrepresentations.  Based on the same factual allegations, Kerr claims a violation of the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.02(A)(1-3) (Count IV).  Kerr also complains of a breach of the Agreement for Freeman's failure to surrender the Contested Technology formulas (Count V), misappropriation (Count VI), conversion (Count VII), and unjust enrichment (Count VIII) for Freeman's use of the formulas.  Finally, Kerr alleges that Freeman falsely advertized itself as the owner of some of the Contested Technology in violation of 15 U.S.C. § 1125(a) (Count III).

The matter is now before the court on Kerr's motion for partial summary judgment on Count V, and Freeman's motion for summary judgment on all counts.

## II.  Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of presenting affirmative evidence negating an element of the non-movant's claim.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir. 2004).  While all reasonable factual inferences must be drawn in favor of the non-movant, "the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  The non-movant has the

-3-

burden to present more than a mere scintilla of evidence, "rather, there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

### A. The Trademark-related Claims

The Lanham Act provides, in relevant part, that

(1)Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin, [or] false or misleading description [or representation] of fact, which–(A) is likely to cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval, of his or her goods [or] services . . . shall be liable in a civil action.

15 U.S.C. § 1125(a)(1)(A).  Similarly, the Ohio Deceptive Trade Practices Act provides, in relevant part, that "when, in the course of the person's business [he] . . . causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," he shall be liable in a civil action.  O.R.C. § 4165.02(A)(2).  Since "[b]oth Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act," this opinion addresses only judicial interpretation of the Lanham Act.  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 626 n.2 (6th Cir. 2002) (comparing Ohio state and federal court interpretations of 15 U.S.C. § 1125(a) and O.R.C. § 4165.01 *et seq.*).  Kerr claims that some of its product designs, trade dress, as well as a registered trademark, are all protected by the Lanham Act.

### 1. Product Design

Kerr argues that the color scheme employed in its investment waxes is a protected product design upon which Freeman has infringed by producing waxes of the same colors.  The court disagrees.  While "a product's trade dress ordinarily consists of its packaging[,] the design given a product by its manufacturer also may serve to distinguish it from the products of other manufacturers

-4-

and hence be protectible trade dress." *Ferrari S.P.A. Esercizio v. Roberts,* 944 F.2d 1235, 1246 (6th Cir. 1991) (quoting *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,* 916 F.2d 76, 78-78 (2d Cir. 1990), *cert. denied,* 499 U.S. 976 (1991)).  But "trademark law does not protect the functional features of products because such protection would provide a perpetual monopoly of features which could not be patented." *Ferrari*, 944 F.2d at 1246 (citing *Keen Corp. v. Paraflex Indus., Inc.,* 653 F.2d 822, 825 (3rd Cir. 1981)).  A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850 (1982).

The parties agree that some buyers of the contested lines of wax products, such as jewelry manufacturers, prefer different colors because they offer greater "readability," the ability to detect imperfections in wax moldings.  There is also evidence that certain customers preferred darker or lighter waxes, which they associated with color.  To allow Kerr exclusive use of the handful of basic colors (e.g., bright red, deep blue), which have functional material application, would provide it with an unfair competitive advantage.  Since Kerr's attempt to protect basic color choices in the manufacture of products is without merit, Freeman is entitled to judgment as a matter of law on this claim.

Similarly, Kerr claims that its use of the flake-form of wax is a protected product design.  Again, the court disagrees.  Again, where "the design feature is related to the utilitarian function of the product," such design cannot be protected.  *Ferrari*, 944 F.2d at 1247 (quoting *Keene Corp.,* 653 F.2d at 825) (recognizing that trademark law only protects designs not significantly related to a product's function and that have achieved secondary meaning).  It is undisputed that Freeman had been manufacturing flake-form wax and selling it to end-users since at least the late 1970's, and

owned a "flaking" machine to produce this wax form.  Furthermore, there is sufficient evidence that buyers desire this product design because of its material applications, providing significant technical advantages over other types of wax products.  Since the flake-form is a utilitarian product design, not an aesthetic one, even if it has gained a secondary meaning suggesting Kerr as the manufacturer, it is not protectible under the Lanham Act.  Even drawing all factual inferences in favor of Kerr, Freeman's motion for summary judgment is properly supported and demonstrates that there remains no genuine question on the functionality of the wax colors or the flake-form, so that Freeman is entitled to summary judgment on those claims alleging infringement and unfair competition of these product lines.

### 2.  Trade Dress

In *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604 (7th Cir. 1986), Judge Posner provided a summary of the purpose behind the trademark protections, for both registered and unregistered trade dress, offered by the Lanham Act:

> The goal of trademark protection is to allow a firm to affix an identifying mark to its product (or service) offering that will, because it is distinctive and no competitor may use a confusingly similar designation, enable the consumer to discover in the least possible amount of time and with the least possible amount of head-scratching whether a particular brand is that firm's brand or a competitors brand . . . .  But it is no purpose of trademark protection to allow a firm to prevent its competitors from informing consumers about the attributes of the competitor's brands . . . .  **To allow a firm to use as a trademark a generic word, or a descriptive word still understood by the consuming public to describe, would make it difficult for competitors to market their own brands of the same product.**

*Id.* at 609 (internal citations omitted) (emphasis added).  Following this analysis, the Seventh Circuit has consistently held that a court doesn't even reach the question of confusion until persuaded that the putative mark is "sufficiently distinctive to warrant prima facie protection as a trademark."  *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992)

(quoting *Blau Plumbing*, 781 F.2d at 610).  The mark must "initially be classified as generic, descriptive, suggestive, or arbitrary."  *Id.* at 392.  The court agrees.  A generic term - like "aspirin" or "light beer" - "is a term used to commonly describe the relevant type of goods or services, and 'cannot become a trademark under any circumstances.'"  *Champions Golf Club, Inc. v. The Champions Gold Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir. 1996) (quoting *Induct-O-Matic Corp.,* 747 F.2d at 362).

   Kerr claims that its wax color names are protected trade dress, which Freeman has infringed upon and competed against by marketing its products under confusingly similar names.  The Supreme Court has held that "color alone, at least sometimes, can meet the basic legal requirements for use as a trademark."  *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 166 (1995).  The Court has found, however, that color is virtually always descriptive, requiring a showing that it has achieved secondary meaning by "act[ing] as a symbol that distinguishes a firm's goods and identifies their source, *without serving any other significant function*."  *Id.* at 166 (emphasis added); *see also Champions Golf Club, Inc.,* 78 F.3d at 1117 (explaining that a merely "descriptive" term specifically describes a characteristic or ingredient of an article).  Thus, the product names "Super Pink," "Aqua Green," "Ruby Red," and "Turqoise," which are merely descriptive of wax color and quality, require a showing of non-functional secondary meaning to obtain protection under the Lanham Act.

   The parties spend a significant portion of their briefs arguing whether color, or merely shade, has a substantial effect on the "readability" of the wax product as desired by the end-user.  For example, a light wax, such as "Super Pink" may be desired by a jewelry manufacturer because it will enable him to "read" imperfections in the mold.  There is

evidence in the record that the choice of color and/or shade of wax was customer preference. While the court is fairly confident that the relationship between color and "readability" is primarily functional, this is not the appropriate inquiry.

Instead, the court must decide whether the use of color as a trade dress is functional, or if it is used only as a symbol to designate a given firm's products.  Kerr's advertisements for "Super Pink," "Aqua Green," "Ruby Red," and "Turqoise" are not intended to identify Kerr as the seller, but rather serve the function of identifying the type of wax being sold (which, as noted above, does have some underlying functionality itself).  Indeed, both Kerr and Freeman may choose to manufacture a silver wax, perhaps based on customer requests for such a color, and both may advertize the new wax product as "Silver Injection Wax," as this is merely a functional use of the descriptive color name in the trade dress of the product, and the buyer will have to inquire into whose silver wax is being sold–Kerr's, Freeman's or that of a third-party competitor.  It is only when Kerr identifies a product as "*Kerr's* Silver Injection Wax" that the buyer will be informed for certain of the source of the product.  Having found that these color names are prevented from carrying a secondary meaning because they are descriptive, functional elements of the trade dress of the products, means that they are not entitled to protection under the Lanham Act and Freeman is entitled to summary judgment for Kerr's failure to prove that element of its prima facie case.

**a) Arbitrary Marks**

While the color names discussed above are functional terms describing the wax products, other color names are clearly fanciful and do not require a non-functional secondary meaning to find protection under the Lanham Act.  Although Kerr's product names "Tuffy

Green" and "NYC Pink" both include a color, the fanciful modifiers "Tuffy" and "NYC" render the names partially arbitrary.  "An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached," like "Camel" cigarettes or "Apple" computers. *Champions Golf Club, Inc.,* 78 F.2d at 1117.

While in everyday parlance the word "tuffy" suggests resiliency, and the abbreviation "NYC" refers to a large American metropolis, neither word is commonly used to modify a color, but instead is a fanciful term used as trade dress to enable easy identification of Kerr's product lines.  Such marks do not require a showing of secondary meaning to be protected, even though they involve colors.

The Sixth Circuit has frequently weighed the following eight factors to determine whether a likelihood exists that relevant consumers will be confused about the source of a given product: (1) strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Daddy's Junk Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir. 1997) (explaining that factors are simply a guide to help determine whether confusion is likely) (citation omitted).  The Sixth Circuit has stated that to defeat a motion for summary judgment in a case where likelihood of confusion is the dispositive issue, "a nonmoving party must establish . . . that there are genuine factual disputes concerning those of the [eight] *Frisch* factors which may be material in context of the specific case." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir. 1991).

-9-

This case presents special problems in evaluating the strength of the factors because the underlying green and pink wax products, being sold by Kerr as "Tuffy" and "NYC," and by Freeman as "Tuf Guy" and "Filigree," are the same two products.  This is unlike a situation where Reebok dresses its shoes with a "wave" logo, similar to the Nike "swoosh," so that consumers are confused as to the origin of the Reebok shoe and may purchase it believing they are buying a Nike, produced by a company they know and trust.  It must also be noted that the ownership of the underlying wax products is a subject of this litigation, and that during the period of competition, both Freeman and Kerr believed themselves to be the rightful owners of the product lines, free to market and sell them as their own.  Finally, Freeman alleges that its trade dress of the green and pink waxes always included the modifier "Freeman's" in an attempt to distinguish the source of its products, and in some trade literature referred to the products as "formerly Kerr's Tuffy Green and NYC Pink."  To this end, Freeman alleges that it sent clarifying letters to customers explaining that it was selling its products directly and not through Kerr.

With these concerns in mind, the court finds that it is unnecessary to examine all eight factors to determine if there exists a genuine issue of material fact with regard to "Tuffy Green" and "Tuf Guy Green" because the "similarity of the mark" and "intent of the defendant" factors raise questions only a jury can answer.

Because both "Tuffy Green" and "Tuf Guy Green" reference the actual color of the product, there will necessarily be some similarity in nomenclature that should not weigh too heavily in the determination of this factor's effect.  Instead, the court finds it proper to compare the modifier in the color names.  "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks."  *Daddy's Junk Music Stores, Inc.,* 109 F.3d at 283 (citation

-10-

omitted).  To the ordinary consumer or reasonable juror, "Tuffy" and "Tuf Guy" are similar enough in appearance, spelling, and suggested meaning to result in some confusion as to origin, and the question is begged: Why else would Freeman have chosen such a similar color name, if not to confuse consumers into mistaking its product for Kerr's?

"If a party chooses a mark with the intent of causing confusion, *that fact alone* may be sufficient to justify an inference of confusing similarity."  *Homeowners Group, Inc.,* 931 F.2d at 1111 (emphasis added) (citation omitted).  Because this issue is dispositive here, the court does not need to evaluate the remaining factors with respect to "Tuf Guy" versus "Tuffy" green.  Evidence that the alleged infringer intended to copy the plaintiff's trade dress suggests that he believed his copying might divert some business from the plaintiff through confusion.  *See Osem Food Industries Ltd. v. Sherwood Foods, Inc.,* 917 F.2d 161, 165 (4th Cir. 1990) (reasoning that "when a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source, as the products whose dress was copied.").  This evidence suggests that there was some thought by Freeman that there would be confusion amongst customers, which it hoped to capitalize on by proffering its own version of green wax in place of Kerr's version.  Because a reasonable jury could find that this color was selected to cause confusion, Freeman's motion for summary judgment is denied with respect to this color name.

The remaining trade dress claim, "NYC Pink" versus "Filigree Pink," does not involve the same linguistic or etymological similarity as encountered above.  No reasonable consumer would confuse a pink wax marketed under the name "NYC" (an abbreviation for "New York City"), with one marketed under the name "Filigree" (a word signifying ornamental openwork of intricate detail).

-11-

The "similarity of the marks" factor does not raise the "intent of the defendant" question, and thus weighs in favor of summary judgment for Freeman on the question of confusion.  Nor do any of the remaining six factors, alone or in conjunction, raise such an issue.  Therefore, Freeman's motion for summary judgment is granted with respect to this color as well.

Because "a thorough and analytical treatment [of the factors] must . . . be attempted," *Home Owners Group, Inc.*, 931 F.2d at 1107, we continue with that analysis with respect to NYC Pink, but "the ultimate question remains whether *relevant consumers* are likely to believe that the products or services offered by the parties are affiliated in some way."  *Id.* (emphasis added).

### i. Strength of the Marks

"The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due."  *Daddy's Junk Music Stores, Inc.,* 109 F.3d at 280 (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir. 1985)).  While the court has already decided that the name "NYC Pink" is partially fanciful, it is not wholly arbitrary, as it refers to a pink wax.  It is quite possible that a consumer desires a pink wax because of its "readability" and understands "NYC Pink" as merely a descriptive term for the color of the product.  It is equally possible that the same consumer has found Kerr's "NYC Pink" to be the best pink wax he has used, so that the color name identifies for him the source of his favorite wax.  But the pink waxes here have no physical differences, and Kerr has failed to submit evidence that the non-physical aspects of "NYC Pink" (e.g., customer service, speedy delivery) were important enough to consumers that they identify "NYC" with such non-physical characteristics.  Additionally, while a registered trademark becomes stronger the longer it is uncontested, *see, e.g. Wynn Oil Co. v. Am.*

-12-

*Way Serv. Corp.,* 943 F.2d 595, 600 (6th Cir. 1991), "NYC Pink" has not been registered.  This factor, therefore, does not raise a genuine issue of material fact.

### ii.  Relatedness of the Goods

"If the parties compete directly by offering their goods or services, confusion is likely *if the marks* are sufficiently similar."  *Autozone, Inc. v, Tandy Corp.,* 174 F.Supp.2d 718, 729 (M.D. Tenn. 2001) (emphasis added) (citing *Daddy's Junk Music Stores,* 109 F.3d at 282).  While it is undisputed that Freeman and Kerr are in direct competition, selling basically the same product, the court has determined that the marks (i.e., "NYC Pink" and "Filigree Pink") are not sufficiently similar, and therefore would not cause a reasonable and prudent consumer to mistake one for the other, even if their physical characteristics are identical.  This factor suggests that summary judgment is appropriate for Freeman.

### iii.  Evidence of Actual Confusion

"Bearing in mind that a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion, not actual confusion, the fact that some confusion already has occurred favors the plaintiff as least to some extent."  *Daddy's Junk Music Stores, Inc.,* 109 F.3d at 284 (emphasis in original).  The record contains evidence that consumers asked Kerr employees who Freeman was and why it was selling the flake-form and colored waxes Kerr had long sold.  While these questions establish some type of consumer confusion, the court does not find that it is the type of confusion recognized by the Lanham Act.  The scope of protection only extends to confusion "as to the origin, sponsorship, or approval of [the goods]."  15 U.S.C. § 1125(a)(1)(A).  There is no evidence, such as consumer surveys, which indicates that consumers mistakenly believed that Freeman's use of the "Filigree Pink" color name meant that it was somehow associated with Kerr or

-13-

that its product originated with Kerr.  Indeed, the anecdotal evidence of confusion indicates that the consumers understood that Freeman and Kerr were two separate entities, in direct competition, though offering substantially similar products.  Since the consumer confusion was not of the type afforded protection by the Lanham Act, this factor does not help to raise a genuine issue of material fact and weighs in favor of summary judgment for Freeman.

Furthermore, Freeman produced at least three different messages clarifying its changed relationship with Kerr, entry into the market, and identity of its waxes.  The Freeman website contains a page that explains that,

> [f]or 18 years (1987-2004), many of Freeman jewelry waxes were sold exclusively under a third party private label (Kerr Corporation).  That relationship has ended.  Freeman has **not** sold or licensed its formulas or manufacturing processes to Kerr Corporation or any third party.  Therefore, the same exact injection waxes that have been sold under the Kerr and/or ACCU brand names between 1987 and 2004 can **now only** be obtained from wax bearing the Freeman label.

(Doc. No. 1-44) (emphasis in original).  A series of faxes went out to existing customers,

> to inform [them] of a coming change in how Freeman Manufacturing and Supply Company will distribute its injection wax products (including Aqua, Turquoise, Ruby Red, and other formulations).  The exclusivity agreement we've had with Kerr since 1987 will be ending on February 1, 2005.  Therefore, as of February 1, 2005, Freeman will be re-branding its injection wax products. . .

(Doc. No. 1-42).  Finally, a longer and more specific letter stated the following:

> Recently, Kerr Corporation began promoting a new brand and new form of jewelry injection wax and is claiming that the formulas are identical to Kerr products.  This unfortunate situation needs to be clarified to protect distributors from misleading their customers. . . Freeman no longer sells wax to Kerr Corporation. . . The eight flake wax formulations that were sold [by Kerr] are now manufactured and sold exclusively under the Freeman Flakes brand name. . . Freeman is now working with its distributors to help them clarify the above to its customers.

(Doc. No. 1-43).  These letters attempted to dispel any confusion customers may have suffered as a result of the changed relationship between Freeman and Kerr and the characteristics, identity,

-14-

source, and affiliation of the waxes.  The clarity of these letters would disabuse anyone of the potential confusion caused by Freeman describing it's colors as "formerly" Kerr's colors.  Kerr has failed to present sufficient evidence of actual confusion or a substantial risk of potential confusion to raise a genuine issue of material fact under this factor alone or in conjunction with the others.

### iv.  Marketing Channels Used

It is undisputed that the trade shows and publications, in which Freeman and Kerr advertised their products, are substantially the same, so that "the marketing approaches employed by each party resemble each other."  *Daddy's Junk Music Stores, Inc.,* 109 F.3d at 285.  While this factor weighs in Kerr's favor, it does not alone raise a question of material fact, nor does it do so when weighed against the other factors.

### v.  Likely Degree of Purchaser Care

While the standard used by the courts is that of the typical buyer exercising ordinary caution, "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper."  *Id.* at 285.  The primary buyers of Freeman's and Kerr's waxes are jewelry manufacturers with intimate knowledge of the products' physical characteristics and material applications.  It is unlikely that a jewelry manufacturer who often works closely with wax would be confused by the advertising material employed by the parties, as each includes product specifications easily read and understood by the average knowledgeable buyer.  This factor does not raise a question of confusion and favors judgment for Freeman.

### vi.  Likelihood of Expansion of Product Lines

No evidence has been presented that establishes a likelihood that the parties will engage in different or greater competition regarding pink wax in the future.  "Although the record does not

-15-

demonstrate necessarily a strong possibility of product line expansion by plaintiff, it does contain an issue of fact regarding expansion." *Id.* at 288.  In this case, this is not an issue of *material* fact to satisfy the nonmovant's requirements under Rule 56, and does not, even in combination with the other factors, raise a question that must be answered by a jury.

In conclusion, Kerr has failed to establish a prima facie case of a likelihood of confusion as to "NYC Pink" and "Filigree Pink," so summary judgment on claims alleging infringement and unfair competition of Kerr's color name is appropriate.  Having concluded that Kerr's generic color names are not protected under the Lanham Act, the only remaining trade dress infringement and unfair competition claim to be sent to a jury is "Tuffy Green" versus "Tuf Guy Green."

It is unnecessary to submit the question of confusion to a jury, however, if Freeman is entitled to a judgment as a matter of law because its use of "Tuf Guy Green" falls under the Fair Use defense.  The Fair Use defense, however, does not apply here.

When "the use of the name . . . charged to be [an] infringement is [used], otherwise than as a mark . . . [and] is descriptive of and used fairly and *in good faith only to describe* the goods or services of such party," the defendant is free from liability for such infringement.  15 U.S.C. § 1115(b)(4); *KPPermanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 124 (2004) (emphasis added) (holding defense available even where likelihood of confusion established). Freeman argues that its advertisements and packaging prominently display the "Freeman" name in an attempt to distinguish its product from Kerr's.  Indeed, it is the word "Freeman" that serves as a mark, and the product color name "Tuf Guy Green" is a descriptive term that identifies product type, not origin or association.  But the language of the statute requires that the descriptive term be employed, in good faith, only to describe the good.  A reasonable person may find that because

-16-

Freeman believes it owns the green wax product line, it acted fairly and in good faith in calling it by a name by which it has been long described.  On the other hand, a reasonable person may find that Freeman did not choose "Tuf Guy Green" only to describe, but also to attempt to confuse consumers into purchasing its good.  This question is closely tied to the "intent of defendant" factor and requires a jury for its resolution, so summary judgment is not appropriate.

### 3.  Trademark

Kerr claims infringement of a registered trademark on the term "Flakes."  Since the flake-form is a basic product design with functionality, the term "flake(s)" must be considered a generic term.  *See Induct-O-Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 362 (6th Cir. 1982) (noting that a generic or descriptive term that is commonly used to name or describe a kind of good cannot become a trademark under any circumstances).  "Flake" is commonly used to describe a variety of wax shape, that which comes in small, flat pieces.  There is no question that the word "flake" as used to modify the form in which certain waxes are produced for an end-user, is intended to convey its dictionary meaning, i.e., 1. A small loose mass or bit.  2. A thin flattened piece or layer.  *Webster's New Collegiate Dictionary* (1979).  Since "flake(s)" is a generic term, it is not entitled to trademark protection and Freeman is entitled to summary judgment on claims relating to its infringement.

Furthermore, Section 37 of the Lanham Act provides, in relevant part, that "[i]n any action involving a registered mark the court may . . . order the cancellation of registrations."  15 U.S.C. § 1119.  The Sixth Circuit has directed that "when a court determines that a mark is either a generic term or a descriptive term lacking secondary meaning, the purposes of the Lanham Act are well served by an order cancelling the mark's registration."  *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 792 (6th Cir. 1983) (citing *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.,*

494 F.2d 3, 14 (5th Cir. 1974)).  Because the term "flake(s)" is generic in this context, the court

hereby orders the cancellation of the registration for this term as a trademark.

**B.  The Contract-related Claims**

The complaint includes a number of claims premised on the allegation that Kerr owns the

Contested Technology under the Agreement.  "The Agreement in question contained a choice of law

provision, and [a]s a general rule, choice of law provisions . . . are valid and enforceable."

*Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000) (internal quotations omitted) (applying

New York contract law).  Accordingly, because the Agreement contains a provision requiring that it

be construed and governed by the laws of New York, the court will respect the parties' choice of

law.  Under New York law, to make out a viable claim for breach of contract, the plaintiff must

establish: (1) the existence of an agreement; (2) adequate performance of the contract by the

plaintiff; (3) breach of contract by the defendant; and (4) damages.  *See, e.g. Eternity Global Master

Fund Ltd. v. Morgan Guaranty Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir. 2004).

The Agreement between Kerr and Freeman provides that all inventions and improvements

arising out of research and development engaged in by Freeman, under the direction of an approved

written proposal by Kerr, belong exclusively to Kerr and cannot be utilized by Freeman for its own

purposes.  Kerr claims that Freeman breached the Agreement by producing and selling the Contested

Technology.  Freeman argues, however, that Kerr failed to secure the right of exclusive use of the

Contested Technology because it failed to fulfill its duty to propose research and development in

written form.  Kerr responds that Freeman waived the requirement of a written proposal through a

20-year course of conduct that constituted a waiver of the duty to produce a written proposal.  There

is no evidence that Kerr submitted anything that would constitute a research and development

-18-

proposal that was approved by Freeman.  But there is some evidence that Freeman engaged in research and development without requiring a written proposal.  While this may constitute a waiver of such a requirement under New York law, the Agreement also included a non-waiver provision, which stated that "[n]o alteration, waiver or change in any of the terms hereof subsequent to the execution hereof claimed to have been made by any representative of either party shall have any force or effect unless in writing signed by the parties hereto or duly authorized agents or representatives of the parties."

This would be fatal to Kerr's contract claims, except that under New York law, "[a] provision in a contract stating that it cannot be modified except in writing may be waived." *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 39-40 (2d Cir. 1986) (referring to this "waiver of a non-waiver provision" as an intentional relinquishment of a known right).  Such a relinquishment can only occur in the narrow context of an oral agreement to modify the contract to allow waivers.  *See, e.g., Grandonico v. Consortium Comms. Int'l, Inc.,* 566 F.Supp. 1288, 1291 (S.D.N.Y. 1983) (holding that without an oral agreement to alter the written contract the fact that the parties acted in a manner inconsistent with the terms of the contract was not sufficient to alter those terms in the face of a non-waiver provision).  The party attempting to prove relinquishment "must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and *an intention to relinquish it.*"  *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank,* 707 F.2d 680, 685 (2d Cir. 1983).  Kerr has not submitted any evidence that it entered into an oral agreement to modify the Development Agreement in a way that either (1) eliminated the requirement of a written proposal for research projects, or (2) eliminated the non-waiver provision of the Agreement such that a waiver of the underlying requirement of a written proposal might be

-19-

accomplished through a course of conduct.  Therefore, Kerr's waiver argument fails as a matter of law.  The Contested Technology belongs to Freeman, who is entitled to summary judgment on the breach of contract claim.  Since the claims for misappropriation, conversion, unjust enrichment, and false advertising are premised on the allegation that Kerr owns the Contested Technology, and the court finds that it does not own the Contested Technology, these claims must all fail as well.  Therefore, Freeman is entitled to judgment as a matter of law on Counts V, VI, VII, VIII, and III.

### III.  Conclusion

For the foregoing reasons, the court grants Freeman's motion for summary judgment in part and denies it in part, and denies Kerr's motion for partial summary judgment.  Freeman's motion for summary judgment is denied with respect to Kerr's trade dress and unfair competition claim for Tuf Guy Green versus Tuffy Green.  A status conference is scheduled for Friday, October 26, 2007 at 11:00 a.m. in Chambers 17b.

IT IS SO ORDERED.

_/s/Ann Aldrich_____
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

Dated:  August 14, 2007